UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD PISTORIO, *et al.*,

      Plaintiffs,

v.                                                                    Case No. 20-11838

FCA US LLC,                                               Sean F. Cox
                                                                      United States District Court Judge

      Defendant.

_____/

### OPINION & ORDER
### GRANTING IN PART, AND DENYING IN PART,
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This putative class action against Defendant FCA US, LLC ("FCA") was filed on July 7,

2020. Plaintiffs asserted a litany of claims, under the laws of numerous states, on behalf of

numerous named Plaintiffs. A number of claims were dismissed at the motion-to-dismiss phase

of the case and the claims of several named Plaintiffs have also been dismissed during the course

of the litigation. The matter is currently before the Court on Defendant's Motion for Summary

Judgment, that seeks summary judgment as to all remaining claims. The parties have briefed the

issues and Court concludes that oral argument is not necessary. Local Rule 7.1.

As explained below, in response to the motion, Plaintiffs agree that the remaining breach-

of-express-warranty claims should be dismissed. They also do not oppose the dismissal of

Plaintiff Murdock's fraud-based claims or Plaintiff Courtney's claim for fraudulent concealment.

As to Defendant FCA's challenges to the remaining claims, the Court GRANTS THE MOTION

IN PART and DENIES IT IN PART. The Court GRANTS the motion to the extent that it grants

1

summary judgment in favor of Defendant FCA as to the following claims:

- Count 12, wherein Plaintiff Gerritsen and the Bagley's assert an Implied Warranty Claim under California law;

- Count 27, wherein Plaintiff Randall Courtney asserts a claim for Violation of the Illinois Consumer Fraud and Deceptive Practices Act;

- Count 28, wherein Plaintiff Randall Courtney asserts a negligent misrepresentation claim under Illinois law;

- Count 37, wherein Plaintiff Paul Murdock's asserts an Implied Warranty Claim under Pennsylvania law; and

- Counts 39 & 40, wherein Plaintiff Paul Murdock asserts fraud and omission-based claims under Pennsylvania law;

The motion is DENIED in all other respects.  Thus, only the following counts remain: 1) Counts 13, 14, 15 & 16 (under California law on behalf of the Bagleys, Gerritsen, and Swindle); and 2) Counts 20, 21, and 22 (under Florida law on behalf of Kloszewski).

## BACKGROUND

### A.    Overview Of Procedural History

Plaintiffs filed this putative class action against Defendant FCA on July 7, 2020.  At this juncture, the operative complaint is Plaintiffs' 177-page "Consolidated Amended Class Action Complaint" filed on August 12, 2021 (the "CACAC").  Plaintiffs describe the nature of the action "a consumer class action concerning FCA's failure to disclose material facts regarding a safety defect in the Class Vehicles sold to consumers and FCA's failure to fulfill its warranty obligations with respect to that defect." (CACAC at ¶ 2).   They allege that "FCA manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles' Uconnect infotainment system ("Uconnect") was defective. Specifically, the Uconnect system is

designed and/or manufactured with screens, including their operating software and routing modules, that suffer from freezing, loss of back up camera functionality, loss of navigation system functionality, black screens, repeated unintentional reboots, and general lack of operation ("Uconnect Defect"). The Uconnect Defect results in the need for frequent software updates and expensive replacements of screens and related components. FCA knew about the deficiencies of the Uconnect well before Plaintiffs purchased their Class Vehicles." (*Id*. at ¶ 4). Plaintiffs allege that, had "FCA disclosed the Uconnect Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles or would have paid less for them." (*Id*. at ¶ 19).

**This Court's Motion To Dismiss Rulings**

On September 9, 2021, Defendant filed a Motion to Dismiss Plaintiffs' Amended Complaint. In an Opinion and Order issued on January 14, 2022, this Court granted that motion in part and denied it in part. (ECF No. 66). The Court granted the motion with respect to the claims on behalf of a nationwide class and dismissed Counts 1, 2, 3, and 4. The Court also granted the motion to the extent that it dismissed: 1) the breach of warranty claims under Florida law, thereby dismissing Counts 18 and 19; 2) the breach of implied warranty claims under Alabama and Illinois law, thereby dismissing Counts 5 and 24; 3) the negligent misrepresentation claims under Alabama law, thereby dismissing Count 9; 4) the Michigan Consumer Protection Act claims, thereby dismissing Count 33; and 5) the unjust enrichment claims, thereby dismissing Counts 4, 10, 17, 23, 29, 35, and 41. After the Court's ruling, the following counts remained: 6, 7, 8, 11, 12, 13, 14, 15, 16, 20, 21, 22, 25, 26, 27, 28, 30, 31, 32, 34, 36, 37, 38, 39, and 40. (*Id.* at 2).

3

**Discovery And Motion Practice**

Thereafter, the case proceeded to discovery.  During the course of the continued litigation, the parties stipulated to the dismissal of the claims of several named Plaintiffs.  (*See* ECF Nos. 74 (Hasan Aktulga); 75 (Sara Elice); 89 (Edward Pistorio, Thomas Kloszewski, and Daniel Przekop).

At the suggestion of the parties, the Court allowed FCA to file a Motion for Summary Judgment before Plaintiffs filed a motion seeking class certification.  Thus, the Court has not yet addressed class certification.

**The Pending Summary Judgment Motion**

On September 19, 2023, FCA filed its Motion for Summary Judgment.  (ECF No. 93).

FCA's motion asserts, and Plaintiffs have not contested, that the claims listed on pages xi-xii of its summary judgment motion are the only claims that remain in this case.  In response to the summary judgment motion, however, Plaintiffs "do not oppose the dismissal of their express warranty claims." (ECF No. 96 at Page.ID.3405).  That means that Plaintiffs agree that Counts 11, 24, and 36 should be dismissed.  That leaves the following claims remaining:

Named Plaintiff / State:                    Counts:

| | |
|---|---|
| Elizabeth & Justin Bagley (California) | Count 12 - Breach of Implied Warranty under Song-Beverly Act<br>Count 13 – Fraudulent Concealment (Calf. Law)<br>Count 14 - Violation of Calf.'s Consumer Legal Remedies  Act<br>Count 15 - Violation of Calf. Bus. & Prof. Code ("UCL")<br>Count 16 - Negligent Misrepresentation (Calf. law) |
| Correy Gerritsen (California) | Count 12 - Breach of Implied Warranty under Song-Beverly Act<br>Count 13 – Fraudulent Concealment (Calf. Law)<br>Count 14 - Violation of Calf.'s Consumer Legal Remedies  Act<br>Count 15 - Violation of Calf. Bus. & Prof. Code ("UCL")<br>Count 16 - Negligent Misrepresentation (Calf. law) |

4

| Marcus Swindle (California) | Count 13 – Fraudulent Concealment (Calf. Law) Count 14 - Violation of Calf.'s Consumer Legal Remedies Act Count 15 - Violation of Calf. Bus. & Prof. Code ("UCL") Count 16 - Negligent Misrepresentation (Calf. law) |
|---|---|
| Randall Courtney (Illinois) | Count 26 – Fraudulent Concealment (Ill. law) Count 27 – Violation of Ill. Consumer Fraud and Deceptive Practices Act ("ICFA") Count 28 – Negligent Misrepresentation (Ill. law) |
| Sandra Kloszewski (Florida) | Count 20 – Fraud. Concealment (Fla. law) Count 21 – Violation of Fla.'s Deceptive and Unfair Trade Practices Act Count 22 – Negligent Misrepresentation (Fla. law) |
| Paul Murdock (Pennsylvania) | Count 37 – Breach of Implied Warranty (Pa. law) Count 38 – Fraud. Concealment (Pa. law) Count 39 – Violation of Pa. Unfair Trade Practices and Consumer Protection Law Count 40 – Negligent Misrepresentation (Pa. law). |

## C.    Evidence Construed In The Light Most Favorable To Plaintiffs

This Court's practice guidelines are included in the Scheduling Order and provide,

consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .

> b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

> c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 2-3).

In support of its motion, Defendant FCA filed "Defendant's Statement of Material Facts Not In Dispute" (ECF No. 93-2, "Def.'s Stmt."). Plaintiffs then filed their "Counter-Statement of Disputed Facts" (ECF No. 97-1, Pls.' Stmt.).

The relevant evidence submitted by the parties, *viewed in the light most favorable to Plaintiffs*, is as follows.

**Elizabeth and Justin Bagley**

Plaintiffs Elizabeth and Justin Bagley purchased a new model-year 2018 Chrysler Pacifica on November 26, 2017, from a third-party dealership in California, the Walnut Creek Chrysler dealership. (Stmts. at ¶ 1; J. Bagley Dep. at 31). One of the things that led the Bagleys to look at a Pacifica was "safety, first and foremost." (E. Bagley Dep. at 43).

Elizabeth testified that before purchasing the vehicle, she had not seen any advertisements or commercials about the vehicle. (E. Bagley Dep. at 46). Elizabeth further testified:

> Q.   Before you purchased the vehicle, do you see anything – excuse me. Strike that.
>       Before you purchased the vehicle, did you see, hear, or read anything that you contend was false?
> . . . .
> Q.   And just to clarify the question.
>       Was there anything that you saw on the Chrysler website or in any materials you may have seen before purchasing the vehicle that you look back now and you say, that was a misrepresentation, that was false? Was there anything like that?
> A.   I guess, I mean, looking back, I wasn't aware of the problem with the Uconnect. So whether or not I can point to if I read something about that, I can't remember.
>       But I assumed that the vehicle would be in full working order, which meant that Uconnect would function as anticipated and as expected.
> Q.   Okay. But just, you don't recall any specific statement that – any specific false representation, any specific act of fraud; right?

6

> A.    Not that I can remember.

(E. Bagley Dep. at 46-47).  Justin testified:

> Q.    Before purchasing the vehicle, do you remember reading, seeing or
>       hearing anything about the backup camera or the Uconnect?
> A.    No.

(J. Bagley Dep. at 34).

Both Justin and Elizabeth testified, however, that they had conversations with the

salesperson at the dealership, including conversations about the Uconnect system and the backup

camera.  Justin testified:

> Q.    In any of the conversations with any of the people at the different
>       dealership that you went to, including the Walnut Creek dealership where
>       you purchased the vehicle, did you have any discussion, conversations or
>       communications about the Uconnect, the back up camera, anything like
>       that?
> A.    At the Walnut Creek where we purchased it and test drove it with – with
>       the sales – salesman, he did show us the system and kind of walked us
>       through it and just kind of described how it worked, and – discussed
>       briefly the backup camera, yeah.
> Q.    Okay.  In that conversation or any other conversation . . . did anyone tell
>       you anything you believed was false?
> A.    In retrospect, they – they sold it so us as a reliable system, and I don't
>       believe that is true. Whether or not they knew that — I don't think they
>       were being purposefully deceitful, but I don't think that the fact that they
>       told us his was a reliable system, that we would – one thing that sticks out
>       to my mind is that they said that, Well, this backup camera is fantastic.
>       Pretty soon you'll be zipping around in no time and ever have to worry
>       about things behind you.  And that was definitely not true in, in retrospect,
>       yes.

(J. Bagley Dep. at 35-36).  Elizabeth testified that the salesperson they dealt with, Michael, tried

to "sell us on the different, you know, attributes of the infotainment system and the vehicle writ

[sic] large."  (E. Bagley Dep. at 26 & 48-49).

Elizabeth testified as follows, when asked about promises made to her about repairs to the

7

vehicle:

> Q.    Before you purchased the Pacifica, did anyone promise you it would never require any repairs?
> A.    No.
> Q.    Did anyone ever tell you your vehicle would never have any problems?
> A.    No.
> Q.    And you understood that from time to time vehicles will develop problems and need repairs?
> A.    Correct.

(E. Bagley Dep. at 53).  Justin responded the same way to those same questions.  (J. Bagley Dep. at 38).

The Bagleys received a written warranty with their vehicle and understood the terms of that warranty would determine when FCA US would pay for a repair and when they would be responsible for a repair.  (Stmts. at ¶ 4).

On September 7 and December 13, 2018, approximately a year after their vehicle purchase, the Bagleys visited a dealership for a recall repair (Recall U73, related to the vehicle's cruise control) and an oil change, but reported no issues with their vehicle's Uconnect or screen at that time.  (Stmts. at ¶ 5).

Elizabeth testified as follows about the nature of this lawsuit and testified the problems began in approximately May of 2019 (about a year and half after the purchase):

> A.    My understanding is that this lawsuit is about a faulty Uconnect system within Chrysler Pacifica vehicles.
> Q.    And can you tell me what issues you had with the Uconnect in your vehicle.
> A.    I can.  So starting back in May of 2019 the Uconnect system screen will go black or sometimes turn a bright blue.  And it happens when reversing, so with the backup camera sometimes, or other times just driving down the road.
>               It will eventually reset itself, especially if the vehicle it turned off and turned back on again.

> Right. And so it was also – so that – yeah, that was May of 2019. And then January of 2020 we continued to have the same problem where the radio screen continues to go blue or black, and will freeze.
>
> And these are the times that we specifically sought out support from maintenance related to this, this issue.

(E. Bagley Dep. at 27-28 & 72-73). Justin testified that these issues "probably started to crop up about six or seven months in." (J. Bagley Dep. at 23 & 41).

When their vehicle displays the blue or black screen, if they don't restart it, it typically would last no more than one minute but, at times it has "gone black for upwards of five minutes" when "driving down a freeway." (E. Bagley Dep. at 30).

On May 14, 2019, Elizabeth visited a dealership to address the issue for the first time. (E. Bagley Dep. at 73-74). The dealership was unable to reproduce or determine the cause of the issue, but provided a free software update. (Stmts. at ¶ 7; Dealership Service Report, ECF No. 93-4 at Page.ID.2772). Elizabeth testified that someone at the dealership told them "this was a known issue, and they did not have a fix at that point in time." (E. Bagley Dep. at 73).

Elizabeth testified that the next time they took their vehicle to a dealership was on January 24, 2020:

> Q. Okay. And let me back up for a second.
> So the Exhibit L is the January 24, 2020 service visit or service record. The mileage listed here, 20,495 miles, does that sound correct?
> A. Correct.
> Q. And so there's a report. What led you to bring the vehicle into the dealership in January 2020?
> A. Warranty. So it was going in for a 20,000-mile warranty. But also, as part of that, we brought up the safety concern with Uconnect . . .

(E. Bagley Dep. at 85-86). The Bagleys again reported that "screen continues to go blue and will freeze." (Dealer Service Report, ECF No. 93-4 at PageID.2728). The report from the dealer

states "There is a software enhancement coming out by the end of first quarter of this year.  No ETA as of yet" and "customer can [c]orrect the intermittent concern with a sleep cycle."  (*Id.*). That report further states "No Repair attempted at this time with Chrysler aware of issue and working on correction."  (*Id.*).  But Elizabeth testified that they did not have a discussion with the dealership about how to set a sleep cycle.  (E. Bagley Dep. at 87).

The Bagleys visited a dealership on June 23, 2020 and August 3, 2020, but there is no evidence that they reported any Uconnect issues during those visits.  (E. Bagley Dep. at 95-101; J. Bagley Dep. at 54-55; Dealer Service Reports, ECF No. 93-4 at PageID.2736 & 2741).

It is undisputed that the Bagley's vehicle has not been taken to any dealership since a June 14, 2021 service visit.  (Stmts. at ¶ 11; Dealer Report, ECF No. 93-4 at PageID.2748). There is no evidence that Uconnect issues were raised during that visit.  (*Id.*).

Elizabeth testified that the issue with Uconnect occurred, during the entire time they owned the vehicle (from 11/26/17 to 12/22) "[b]allpark, between both Justin and myself would be less than two dozen times probably, around two dozen times."  (E. Bagley Dep. at 28-29). Justin testified, however, that the "issue with the Uconnect system" was occurring more frequently than that.  (J. Bagley Dep. at 17).  Justin testified that, "in reality, I'm sure it happened significantly more than that.  I would say a hundred times."  (*Id*)

The Pacifica vehicle is the only vehicle the Bagleys own, and while they work remotely they use that vehicle to drive their children to school and after-school activities.  (Stmts. at ¶ 13).

As of December 2022, the Bagleys have driven their Pacifica approximately 39,000 miles, including taking the vehicle on various cross-county trips between Wisconsin and the west coast and have no plans to sell it.  (Stmts. at ¶ 14).  Elizabeth testified that she has no plans to

sell the vehicle to "someone else, given the safety concerns." (E. Bagley Dep. at 110).

When asked if the Bagleys have been charged for any repairs related to the Uconnect,

Elizabeth testified, "[t]here has not been a repair yet, so there has been no charge." (E. Bagley

Dep. at 128).

**Randall Courtney**

Plaintiff Randall Courtney purchased a new model-year 2018 Chrysler Pacifica from a

third-party dealership in Illinois on January 30, 2018. (Stmts. at ¶ 16).

Courtney testified that he read some reviews on the internet before he purchased his

vehicle:

> Q.    And did you do any research on the Pacifica before you purchased it?
> A.    Yes.
> Q.    What did you do?
> A.    Went on the Internet to see reviews, found that it was pretty much the first
>       generation of the Pacifica. I read reviews from Car and Driver, Motor
>       Trend, stuff like that.
> Q.    Did you look at Consumer Reports?
> A.    Yes, I did. But being that it was a rather new vehicle, it was mainly just
>       reviews of how it drove and the safety features because it did have a five-
>       star rating if I remember correctly from the National Transportation and
>       Highway Safety Board, and that's a key factor for me is what does the
>       National Transportation and Highway Safety Board rate the vehicle as far
>       as collision. So, and then I mean the reliability factor is, I mean all of my
>       Chrysler products have lasted me a lot. But, I mean I just researched it,
>       and the reviews for the drives were awesome, smooth drive, and it really
>       was a smooth-driving vehicle.
> Q.    Did you look at FCA's website?
> A.    Yeah, I went to see features and what vehicles offered what.
> Q.    Do you remember if you saw any advertisements for the vehicle?
> A.    Yes, on the TV.
> Q.    Do you remember if those advertisements were from FCA or from the
>       dealership?
> A.    FCA.

(Courtney Dep. at 46-47). Courtney testified that he believes he was misled because of a sales

11

person at the dealership "saying how great the Uconnect system was when it wasn't." (*Id.* at 50).

Courtney received a written warranty with his vehicle and understood the terms of that warranty would determine when FCA US would pay for a repair and when he would be responsible for a repair. (Stmts. at ¶ 20).

On March 5, 2019 (at 21,770 miles), Courtney returned to the dealership for an oil change and also reported his vehicle was exhibiting periodic problems playing DVDs for rear-seat passengers and controlling the volume for DVDs playing on the rear-seat screens. *See id.* at pp. 69:16-70:22 ("A: Basically, you put a DVD in and it shows up in the rear, sometimes it does, sometimes it doesn't, but we can't control anything from the front. Like, if [rear seat passengers] wanted to go back or something like that … they can't adjust the volume. So we have to control the volume up front, and we couldn't do it"). (Stmts. at ¶ 21).

On January 24, 2019, Courtney visited a dealership reporting that "[t]he rear video screens would turn on sometimes and not turn on [sometimes]." *See* Courtney Dep., pp. 75:22-76:16 ("like when we first start the vehicle, the screens in the rear … would not come on … and then I would go in the back when it happened, because my grandchildren were complaining, and try to use the remotes to turn it on, and it would not come on"). (Stmts. at ¶ 24).

On June 24, 2019, Courtney returned to a dealership and reported that the rear-seat entertainment system was "not working," and that videos were playing on the wrong screen or a rear-seat screen "just shuts off." (Stmts. at ¶ 27).

Courtney was not charged for any repair or service related to the Uconnect or screens in his vehicle. (Stmts. at ¶ 29).

By the time Courtney traded in his vehicle in March 2023, he had driven it over five years

and approximately 98,000 miles. (Stmts. at ¶ 30).

During the time that Courtney owned his Pacifica vehicle, his wife drove the vehicle

"[d]aily," his son drove it "about three to four times a week," and he and his family used the

vehicle to drive "pretty much wherever we needed to go." *See id.* at pp. 55:23-56:22 (Courtney's

family drove the vehicle to drive to "[g]rocery stores, used it to go down to, you know, trips

[from Illinois to] Louisiana, Tennessee, school, drop off my granddaughter from daycare on

Wednesdays, and then we would bring them home to their father's house, and then Sundays

basically just, it was the family car, so pretty much wherever we needed to go it [was] the main

vehicle that we took") (Stmts. at ¶ 31).

**Corey Gerritsen**

Corey Gerritsen purchased a new model-year 2018 Chrysler Pacifica from a third-party

dealership (Rydell Chrysler Dodge Jeep Ram) in California on March 26, 2018.  (Stmts. at ¶ 32;

Gerritsen Dep. at 28).

Gerritsen did some research, saw some advertisements, and had some conversations with

people at the dealership about options prior to his purchase.  (Stmts. at ¶ 33).  He received a

written warranty with his vehicle stating when FCA US would pay for a repair and when he

would be responsible for a repair.  (Stmts. at ¶ 34).

On September 12, 2018, Gerritsen returned to the dealership reporting problems with the

rear-seat screens in his vehicle. *See id.* at pp. 64:3-66:14; Ex. C, p. PistorioPlaintiffs0000021

("CUSTOMER STATES REAR TV SCREENS INOP. [] PLEASE CHECK AND ADVISE");

*see also* Gerritsen Dep., pp. 69:21-73:6 (explaining issue was problems loading the DVD

"Theater App" to play videos for rear-seat passengers, a "lack of DVD controls," and that "you

could only decide whether the sound [from a DVD] would come through the speakers from the front," and the rear screens turning off entirely at times).  (Stmts. at ¶ 35).

At the September 12, 2018 service visit, the dealership rebooted the vehicle's rear VRM module and also provided a software update for free.  (Stmts. at ¶ 36).  But Gerritsen testified that, after that visit, the system seemed to get worse:

> Now, this was . . . again, I think this was the first software update.  So at this point, we didn't know that this was going to be an ongoing problem.  Right.
> But then we did have, after that service it seemed to have more reboots and lack of controls.  And I think, this is my wife that said, "instead of a couple times a week, it was every couple days."
> So we'd been having these issues, and then the screens totally went blank for a while.  Maybe a week.  And then after the service, the screens worked again but it was having problems more often.

(Gerritsen Dep. at 68).

On January 7, 2019, Gerritsen returned to the dealership and reported his vehicle was now exhibiting problems with the rear-seat screens not playing, as well as an issue with rearview camera not operating or continuing to "show[] the rearview camera while we were in drive." (Stmts. at ¶ 37).  At that service visit, the dealership determined that the VRM module was not responding and updated its software.    (Stmts. at ¶ 38).

But Gerritsen returned on March 11, 2019, complaining of issues with the Uconnect system.  He reported that the vehicle's radio "freezes" with "Bluetooth music paus[ing] [and] theat[er] mode volume loud from rear speaker."  (Stmts. at ¶ 39).  The dealership concluded the radio unit installed in it was "internally faulty" and replaced it.  (Stmts. at ¶ 40).

On June 24, 2019, Gerritsen returned to the dealership for an oil change and also reported a problem with entertainment features "freez[ing]," but the dealership found no issues. *See*

14

Gerritsen Dep., Ex. G, p. PistorioPlaintiffs0000141; *id.* at Ex. O, pp. 2-3 ("Can't control console, DVD showing but locked up, no bottom nav controls … Theater app won't work. Won't let the volume change…until after switched radio which is significantly louder … after playing for 7.5 minutes, the audio stopped working for the DVD player. [S]witching apps, pressing listen in, switching to radio and back all didn't work. [E]lections [sic] disc and putting it back in worked, but then needed to be skipped to the right place"); *see also* Gerritsen Dep., pp. 126:17-128:16, 182:18-189:15.  (Stmts. at ¶ 41).

Over the next two years, Gerritsen brought his vehicle in for service on various dates, and no complaints were noted on service records.  (Stmts. at  ¶ 42).  Gerritsen testified that he raised complaints about the Uconnect with the dealership but was told there's nothing they could do and they didn't even put it on the invoices.  (Gerritsen Dep. at 132-34).

On May 17, 2021, Gerritsen returned to a dealership for a transmission issue and also reported that his vehicle's "audio [was] not loading after updates were perform[ed]," at which point the dealership performed a "factory reset" of the audio system and found the vehicle working as designed.  (Stmts. at ¶ 43).

On March 1, 2022, Gerritsen returned to a dealership for a repair of his vehicle's front suspension and a "loose" electric charging port, but reported no issues related to the Uconnect at this visit.  (Stmts. at 44).

As of the last service visit in March 2022, Gerritsen's vehicle had been driven 51,336 miles.  (Stmts. at 47).

**Sandra Kloszewski**

Plaintiff Sandra Kloszewski purchased a new model-year 2018 Chrysler Pacifica vehicle

from a third-party dealer (Arrigo Dodge) in Florida on September 2, 2018.  (Kloszewski Dep. at 6, 13 & 111).  Before going to the dealership, she saw some commercials for the vehicle.  (*Id*. at 118-20)

Kloszewski's vehicle came with a warranty booklet stating when FCA US would provide a free repair, and when she would be responsible for paying for a repair.  (Stmts. at ¶ 51).

After buying her vehicle, she visited a dealership on September 7, 2018, and December 18, 2018 for various reasons but did not report problems with her vehicle's Uconnect system during those visits.  (Stmts. at ¶ 52).  But she testified she did not take her vehicle into the dealership "every time it occurred, because I thought is was just glitching."  (Kloszewski Dep. at 134).  She testified that while the problems may have occurred before this visit, it did not happen frequently enough for her to mention it at the December 18, 2018 service visit.  (*Id*.).

On February 26, 2019, Kloszewski returned to the dealership reporting that her vehicle's Uconnect screen had gone "completely blank."  (Stmts. at ¶ 53).  The dealership initially diagnosed this as an internal problem with the display screen, but when replacing the screen failed to remedy the issue, it later replaced a low voltage differential signal cable after Kloszewski continued to have problems.  (Stmts. at ¶ 54).

In late May/June 2019, Kloszewski returned to the dealership reporting a different issue – her vehicle would not play Sirius satellite radio after the prior repair.  (Stmts. at 55).  Kloszewski testified that she had to call "Sirius, and get it all reprogrammed."  (Kloszewski Dep. at 140-41).

Kloszewski also testified that she did not take her vehicle in for service every time she had a problem with the Uconnect.  (*See, e.g*, Kloszewski Dep. at 149, "Any time the radio would glitch, go black and come back on, I would not spend my time taking it in.  I only took it in at

periods where it would not come back on." and at 168 (testifying that she had a problem with the screen going black on a trip to Walmart the night before her deposition but, by the time she returned home, it was working again.)

Kloszewski has driven her Pacifica vehicle over five years and 50,000 miles. (Stmts. at ¶ 59).

**Paul Murdock**

Plaintiff Paul Murdock purchased a new model-year 2017 Chrysler Pacifica from a third-party dealership in Pennsylvania on December 28, 2016.  (Stmts. at ¶ 61).

Murdock testified that he looked at a Chrysler website before he purchased his vehicle, but he does not recall much:

> Q.    Did you do any research on Pacifica vehicles before going to the dealerships?
> A.    Just looked at the Chrysler site.
> Q.    Do you remember what specifically you looked at on that website?
> A.    No.
> Q.    Do you remember anything about what you looked at on the website?
> A.    Whatever the splash page, for lack of a better term, would have been at the time.
> Q.    Do you remember anything else you looked at or saw; advertisements, flyers, anything else like that related to the Pacifica vehicle in the course of purchasing?
> A.    No.

(Murdock Dep. at 40-41).  Murdock further testified:

> Q.    All right.  Across any of three visits at the Tollman dealership, did you have any discussions with anyone there about the Uconnect, the radio, backup camera, anything like that?
> A.    When we took ownership of the vehicle, the sales rep showed us how to pair our phones with the vehicle, that that's about it.
> Q.    No other conversation with anyone at the dealership other than that?
> A.    Not that I recall.

(Murdock Dep. at 42).

No one told Murdock his vehicle would never require any repairs, and he understood his vehicle would eventually require repairs.  (Stmts. at ¶ 63).

Murdock's vehicle included a warranty booklet, and he understood the terms of the written warranty would determine what repairs FCA US would provide for free and what repairs he would be responsible for. (Stmts. at ¶ 64).

Murdock returned to the dealership on March 17, 2017 reporting that his vehicle's climate controls would not sync, a problem using a remote-start feature to turn on the vehicle's heated seats and wheels, and that its "[b]ackup camera intermittently has the screen go blank." (Stmts. at ¶ 65).

At the March 17, 2017 service visit, the dealership could not duplicate Murdock's issues with the climate controls or remote-start of heated seats/wheels, but advised him that the outside ambient temperature needed to be below 40 degrees for the remote-start of heated seats/wheels to function. (Stmts. at ¶ 66).  The dealership could not duplicate the backup camera issue at the March 17, 2017 service visit, but found a stored trouble code ("B15AA, lost low voltage differential signal connection with display 1"), and asked Murdock to return if the issue reoccurred.  (Stmts. at ¶ 67).

Over the next year, Murdock and his wife returned to the dealership on April 28, 2017 (for an oil change), October 18, 2017 (for an oil change, door issues, and tailgate issue), and January 2, 2018 (for a seatbelt repair, emissions inspection, and hinge repair), but reported no further problems with the vehicle's backup camera, climate control, or remote-start feature for heated seats/wheels.  (Stmts. at ¶ 68).

18

Murdock and his wife returned to the dealership on September 26, 2018, December 24, 2018, and September 6, 2019, to get the vehicle's oil changed and address other issues but did not raise any issues with the Uconnect during those visits.  (Stmts. at ¶ 70).

Murdock testified that, sometime before 2020, he brought his vehicle in for service and reported a problem with his kids not being able to use the screens in the back of the vehicle:

> Q.    Okay.  And so this is before the pandemic you took the vehicle in.  What do you remember about that?
> A.    I just remember talking with a service advisor saying that the screen had frozen up, the rear screens.  And you may remember from the late '90s or early 2000's where the windows would freeze and go one on top of the other.  Same thing was happening and it made – my kids couldn't actually utilize the Uconnect system in the back.
> Q.    And so – okay.  So this is the screens were talking about here would be the two screens on the back of the seats, right?
> A.    Yes.
> Q,    So the screens that the back seat passengers watch or the kids want to watch a video or something?
> A.    Yes.
> . . . .
> Q.    And about how many times did this happen?
> A.    That happened twice.

(Murdock Dep. at 87-88).

The third and final time that Murdock reported any potential issues with his vehicle's Uconnect was on January 13, 2020 (at 48,754 miles), when he visited a dealership for a check engine light and also reported that his vehicle's "navigation [was] not showing [the] correct location."  (Stmts. at ¶ 71).  Murdock testified as following regarding the work done at that visit:

> Q.    And based on this, it looks like the dealership updated some software and then at least they determined at this point that the navigation was working correctly.
> After you picked the vehicle up, was the navigation working right?
> A.    As far as I know, yes.
> Q.    Have you ever had any problems with the navigation in the vehicle after

19

<div style="margin-left:2em">

this service visit in January of 2020?

A.     I personally stopped using it.

Q.     Okay.  Are you aware of any problems your wife had with the vehicle with the navigation after this?

A.     She hasn't mentioned it.

</div>

(Murdock Dep. at 81-82)

Murdock does not recall reporting any Uconnect problems during his subsequent visits to the dealership on June 26, 2020, November 10, 2020, and the dealership service records show no such report, complaint, or request for a repair.  (Stmts. ¶ 73).

Aside from any issues related to the climate control and remote start for heated seats/wheels, Murdock has not observed any issue potentially related to his vehicle's Uconnect in "a couple years."  (Stmts. at ¶ 76).

Murdock had driven his vehicle over 80,000 miles as of his deposition in October 2022, he and his wife are still driving the vehicle today, and they have consistently used it for driving to work, running errands, transporting their children, and taking his family on long trips to New York, Florida, and Delaware. (Stmts. at ¶ 78).

**Marcus Swindle**

Plaintiff Marcus Swindle purchased a used model-year 2017 Chrysler 300 from a third-party dealership (Moss Bros.)  in Florida on June 12, 2029.  (Swindle Dep. at 16).

Prior to his purchase, Swindle did not research the Uconnect, visit the FCA website, or read any reviews.  (Swindle Dep. at 91-92)  Swindle testified that he had seen some advertisements:

<div style="margin-left:2em">

Q.     Have you ever seen any advertisements for the Chrysler 300?

A.     Yes.

Q.     Do you believe that any of the advertisements you've seen are false or

</div>

> misleading?
>
> . . . .
>
> THE WITNESS: When it comes to some of the safety issues, yes.
>
> . . . .
>
> Q.    Okay.  And specifically what advertisements have you seen that are
>        misleading as relates to safety issues?
>
> A.    When it shows you guys have CarPlay and everything is good and
>        (unintelligble) --
>
>        THE WITNESS: Everything is good, but it's really not because I have th
> car myself.  So I know what really is the problem with the safety features when it
> comes to Uconnect and the other issues.

(Swindle Dep. at 92-93).

At the time of Swindle's purchase, his vehicle had already been driven 47,762 miles, and

its 3-year/36,000 mile Basic Limited Warranty had expired.  (Stmts. at ¶ 80).

Swindle returned to the dealership on August 16, 2019 (at 52,768 miles for an oil change,

tire rotation, and service for a brake issue), but reported no issues related to his vehicle's

Uconnect at this visit. (Stmts. at ¶ 82).

Ten months after his vehicle purchase, on April 17, 2020 (at 68,695 miles), Swindle

returned to the dealership reporting an engine noise, leaking oil, and that the "radio is not turning

on at times, stays black."  (Stmts. at ¶ 83).

At this service visit, the dealership tested the radio (at no charge), found it working, and

could not duplicate the reported issue.  (Stmts. at ¶ 84).

Swindle returned to the dealership on five other occasions in 2020 and 2021, but the

service records for those visits do no reflect any report of problems with the Uconnect system.

(Stmts. At 85). Swindle testified, however, that he did let the dealership know he had problems

but they just did not list it on the records and he was "basically" "called a liar to my face," "So

they didn't note it no more."  (Swindle Dep. at 132-33).  Swindle testified that he had problems

with his vehicle's Uconnect:

> Q.    Can you identify for me all the issues that you believe you had with your
>        Uconnect?
> A.    Freezing while driving. Failure in reverse.  I had a lot of safety issues with
>        Uconnect system.

(Swindle Dep. at 78).

As of May 2021, Swindle's vehicle has been driven over 94,000 miles, and Swindle still

drives his family and children in the vehicle.  (Stmts. at ¶ 86).

**The Written Warranties For The Named Plaintiffs' Vehicles**

When Plaintiffs' vehicles were originally sold, they included written warranty booklets

which provided, in part, as follows:

> 1.    Your Legal Rights Under These Limited Warranties
> The warranties contained in this booklet are the only express warranties
> that FCA US LLC ("FCA US") makes for your vehicle … For example,
> you may have some implied warranties, depending on the state where
> your vehicle was sold or is registered.
>
> These implied warranties are limited, to the extent allowed by law, to
> the time periods covered by the express written warranties contained in
> this booklet.
>
> 1.1. Incidental and Consequential Damages Not Covered
> Your warranties don't cover any incidental or consequential
> damages connected with your vehicle's failure, either under
> warranty or afterward.
> Examples of such damages include:
> ● lost time;
> ● inconvenience;
> ●the loss of the use of your vehicle;
> ●the cost of rental vehicles, gasoline, telephone, travel, or lodging;
> ●the loss of personal or commercial property; and
> ●the loss of revenue …
>
> Basic Limited Warranty…

22

What's Covered
The Basic Limited Warranty covers the cost of all parts and labor
needed to repair any item on your vehicle when it left the manufacturing
plant that is defective in material, workmanship or factory
preparation…

When It Begins
The Basic Limited Warranty Begins on either of the following dates,
whichever is earlier:
● the date you take delivery of the vehicle; or
● the date when the vehicle was first put into service…

When It Ends
The Basic Limited Warranty lasts for 36 months from the date it begins
or for 36,000 miles on the odometer, whichever comes first…

How to Get Warranty Service…
Warranty service must be done by an authorized Chrysler, Dodge, Jeep,
or Ram dealer…

(Stmts. at ¶ 87).

On December 12, 2019, FCA US announced Recall VE2/NHTSA 19V- 886, providing

owners of model-year 2018-2019 Chrysler Pacifica vehicles with a free repair and reimbursement

for any prior repairs related to a vehicle's backup camera view continuing to display after a

vehicle is put into drive.  (Stmts. at ¶ 88).

By letter dated December 23, 2019, from Joshua Neff to Jennifer Shute, NHTSA

acknowledged Recall VE2/NHTSA 19V-886. (Stmts. at ¶ 89).

In January 2020, and revised in February 2020, FCA US issued Dealer Service

Instructions for Safety Recall VE2/NHTSA 19V-886. (Stmts. at ¶ 90).

## STANDARD OF DECISION

Summary judgment is appropriate only "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

23

Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).

As the party bringing the summary judgment motion, FCA "has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." *Id*. (citation and internal quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.' " *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (quoting *Moore v. Philip Morris Cos*., 8 F.3d 335, 340 (6th Cir. 1993)).

In reviewing FCA's summary judgment motion, this Court views all facts and inferences in the light most favorable to Plaintiffs, the nonmoving parties. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). In doing so, this Court does "not judge credibility or weigh conflicting evidence; instead, [it] believe[s] the evidence of the nonmoving party, and draw[s] all 'justifiable inferences' in [their] favor." *Briggs v. University of Cincinnati*, 11 F.4th 498, 507 (6th Cir. 2021).

24

**ANALYSIS**

Defendant FCA's summary judgment motion includes numerous challenges to the remaining claims in this case.

## I.     Lack Of Standing / Mootness For Rear-Camera-Stays-On Issues

FCA's first argument is presented in a very cursory manner.  Its argument on standing mootness is presented in two paragraphs.  (*See* Def.'s Br. at 14-15).  And, unlike the other challenges in its motion, this one does not apprise the Court (or Plaintiffs) which claims or counts this challenge relates to.

Thus, in response, Plaintiffs understandably fails to see what claim or claims are being challenged by this vague challenge.  (Pls.' Br. at 18) ("It is unclear what FCA seeks through its 'lack of standing/mootness' argument. . . Whether FCA seeks dismissal of a claim if it is solely based on the 'rear-camera-stays-on' system (none are) or to preclude evidence of this symptom, FCA's argument should be rejected.  This symptom is one piece of evidence that supports the existence of the Uconnect Defect.").

The Court rejects this challenge as Defendant has failed to meet its burden of establishing that it is entitled to summary judgment as to any remaining counts based on this cursory argument.

## II.     Lack Of Evidence To Support Causation/Damages

FCA asserts that evidence of causation and damages are essential for all remaining claims in this case.  (Def.'s Br. at 15).  Although this section of its brief is titled "Lack of Evidence To Support Causation/Damages," this section of FCA's brief focuses on damages, not causation. FCA argues that Plaintiffs  "received free repairs whenever they reported any Uconnect issue,

and have no evidence to show they ever paid for any such repair." (*Id.*).  FCA further argues:

> That Plaintiffs seek "benefit of their bargain"/"diminished value" damages (*see, e.g.*, CCAC,¶ 315 (PageID.1219)) cannot remedy their lack of evidence. Such damages are measured "by the **lesser** of (1) the cost of repair, or (2) the difference between the fair market value of the vehicle as warranted and the fair market value of the vehicle as sold, reduced according to Plaintiffs' ability to mitigate or avoid damages." *In re Takata Airbag Prods. Liab. Litig.*, 2022 WL 17546365, **7-8 (S.D.Fla. 2022) (emphasis added) (granting summary judgment on claims under California, Florida, Illinois, and Pennsylvania laws for any plaintiff who "had or could have had" a repair "free of charge"); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 407 F.Supp.3d 212, 225, 230-32 (S.D.N.Y. 2019). Thus, Plaintiffs lack any claim based on issues that were, or could have been, repaired for free.

(*Id.* at 15-16).

In response to this argument, Plaintiffs make several points.  First, they assert that they "were damaged at the point of sale when they unknowingly paid for vehicles with a defective Uconnect infotainment system that exhibits numerous system-crippling malfunctions and presents dangerous safety risks" and assert:

> It is well recognized that such a "benefit of the bargain" theory is an economic injury to consumers. *See, e.g.*, *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 857 (6th Cir. 2013) ("[A]ll Duet owners were injured at the point of sale upon paying a premium price for the Duets as designed."); *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2017 WL 1382297, at *5 (E.D. Mich. Apr. 18, 2017) ("When a manufacturer sells a product that is defective, which causes consumers to be misled at the point of sale into paying more and getting less than they believed they were purchasing, the consumers suffer an injury in fact."); *see also Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 822 (9th Cir. 2019).

(Pls.' Br. at 21).

Plaintiffs also assert that "FCA's Motion rests on the false assertion that Plaintiffs "received free repairs" and assert that the evidence presented shows that "Plaintiffs' vehicles have suffered from manifestations of the Uconnect Defect from soon after purchase and have

26

continued for years despite FCA's numerous attempted 'repairs.' At a minimum, given the

ongoing Defect symptoms experienced by Plaintiffs, whether FCA has ever actually 'repaired'

their vehicles is a question of fact for the jury." (Pls.' Br. at 21).

Finally, Plaintiffs assert that "even if the Court were to conclude that FCA somehow

effectively remedied the Uconnect Defect," Plaintiffs "would still be entitled to damages. *See*

Section III.B, *supra* (citing *Raymo*, 475 F. Supp. 3d at 695; *Weidman*, 2022 WL 1071289, at \*4);

*see also Leon v. Continental AG*, 301 F. Supp. 3d 1203, 1219 (S.D. Fla. Mar. 20, 2017) (allowing

claims for "lost benefit of the bargain" to proceed despite availability of repair). A repair does

not eliminate Plaintiffs' point-of-sale injury and restore them to the position that they bargained

for. Accepting FCA's position would mean that a manufacturer could sell defective vehicles on

the cheap with no consideration for safety, wait until a lawsuit is filed years later, and then issue

a recall to avoid any repercussions." (*Id*. at 22).

In its reply brief, FCA then talks about causation. (Def.'s Br. at 9). But the Court does

not consider new arguments raised in a reply brief. As to damages, FCA asserts that none of the

cases cited by Plaintiffs address how damages are measured "when free repairs have been

provided" and assert that "every claim" "fails to the extent it was based on an issue repaired for

free." (*Id*. at 9-10).

FCA's argument misses the point. The evidence presented by Plaintiffs, viewed in the

light most favorable to Plaintiffs, is that the attempted repairs provided to them have not

remedied the problems. (*See, eg.*, E. Bagley Dep. at 128, "[t]here has not been a repair yet, so

there has been no charge.").

The Court rejects this over-arching ground for relief as there are issues of fact as to

27

whether Plaintiffs can establish damages.

## III.   Express Warranty Claims (Counts 11, 24, and 36)

Notably, in response to FCA's motion, Plaintiffs "do not oppose the dismissal of their express warranty claims." (ECF No. 96 at Page.ID.3405).  Thus, the Court shall dismiss Counts 11, 24, and 36 with prejudice.

## IV.   Implied Warranty Claims (Counts 12 and 37)

Next, FCA seeks summary judgment in its favor as to the two remaining implied warranty counts (Counts 12 and 37).

### A.   Challenge To Murdock's Implied Warranty Claim (Count 37)

FCA contends that Murdock's implied warranty claim is barred by the applicable statute of limitation, arguing:

> Murdock purchased his vehicle on December 28, 2016 (*see* SOF No. 61), and the written warranty for his vehicle provides that the "implied warranties are limited, to the extent allowed by law, to the time periods covered by the express written warranties contained in this booklet," *i.e.*, 3 years or 36,000 miles (SOF No. 87; *see also* Murdock Dep., Ex. H, pp. 4, 6). Pennsylvania law holds that such provisions are fully enforceable, and that any implied warranty claim is time-barred if filed after the express warranty period. *See, e.g.*, *Voicheck v. Ford Motor Co.*, 2013 WL 1844273, *4 & fn.7 (E.D.Pa. 2013); *see also Webb v. Volvo Cars of N.A., LLC*, 2018 WL 1470470, **9-10 (E.D.Pa. 2018). Since Murdock did not file his claim until July 7, 2020 (*see* ECF #1), more than three years after his purchase, his implied warranty claim in Count 37 is time-barred.

(Def.'s Br. at 21).

In response, Murdock asserts that this implied warranty claim is timely.  (Pls.' Br. at 22).

He asserts that:

> The Pennsylvania Commercial Code has a separate provision for modifying the implied warranty of merchantability, 13 Pa. Stat. and Cons. Stat. § 2316, and for reducing the period of limitations on contracts for sale. 13 Pa. Stat. and Cons.

28

> Stat. § 2725. Courts in this District interpret language like that in FCA's written warranty not as impacting the statute of limitation, but as modifying the implied warranty to require manifestation of a defect within the duration of the written warranty. *See Norman v. FCA US, LLC*, 2023 WL 6388926, at *12 (E.D. Mich. Sept. 30, 2023).

(Pls.' Br. at 23).  Thus, the only case that Murdock directs the Court to in support of his position is the district court's decision in *Norman*.

As Defendant correctly notes, the only decision that Plaintiffs direct this Court to, *Norman*, was a decision by Judge Terrence Berg wherein he actually noted that Courts in this district have enforced similar limiting provisions as to implied warranties.  *Norman, supra*, at 12-14.  Thus, *Norman* does not aid Plaintiff Murdock.

And the cases cited by Defendant support its position that Plaintiff Murdock's implied warranty claims against Defendant are time-barred based on the language of the warranty limitations.  *See Voicheck, supra*  ("Plaintiff's implied warranty claims are time-barred because the language of Ford's warranty explicitly limits the time period of the implied warranty."); *Webb, supra*, at *9 (agreeing with Defendant that implied warranty claim was subject to dismissal based on language of limited warranty); *Werwinski v. Ford Motor Co.*, 2000 WL 1201576 at * 3-4 (E.D. Pa. 2000) (dismissing implied warranty claims based on limiting language of express warranty, ruling "Since Pennsylvania allows implied warranties to be limited, the named Plaintiffs remedy under the implied warranty of merchantability expired no later than their claim under their respective express warranties" and dismissing those claims as time-barred).

Thus, the Court grants summary judgment in favor of Defendant as to Plaintiff Murdock's breach of warranty claim (Count 37).

29

**B.      Challenge to Gerritsen/Bagley's Implied Warranty Claims (Count 12)**

Next, Defendant seeks summary judgment in its favor as to Count 12, the breach of

implied warranty claims asserted under California law by Gerritsen and the Bagleys.  Defendant

contends that these claim fail for "lack of evidence that their vehicles were unmerchantable."

(Def.'s Br. at 21).  In support of this challenge, Defendants contend that "[u]nder California law,

implied warranties do not require perfection, but only 'a minimum level of quality' – which is

met if a vehicle was 'fit for driving.'" (*Id.*).  FCA asserts that "where a consumer has been able to

drive his or her vehicle for years and tens of thousands of miles despite an alleged defect, courts

agree no lack of merchantability can be found."  (Def.'s Br. at 21).  In support of this challenge,

FCA directs the Court to decisions such as:  *Martinez v. Ford Motor Co.*, 2023 WL 2977727 at

*6 (S.D. Cal. 2023); *Blissard v. FCA US LLC*, 2018 WL 6177295 at *7-8 (C.D. Cal. 2018);

*Yi v. BMW of N. Am., LLC*, 2018 WL 3359016 at * n.5 (C.D. Cal. 2018); and *Beck v. FCA US*

*LLC*, 273 F.Supp.3d 735, 762 (E.D. Mich. 2017).

In support of this argument, FCA directs the Court to the testimony of the Bagleys and

Gerritsen:

> Plaintiffs' own testimony confirm they lack t[he] evidence needed to prove any
> lack of merchantability.  The Bagley's have driven their vehicle for 5+ years and
> 39,000 miles, it is the only vehicle they own, and even today they continue to
> drive their children in it despite the two instances when they have reported an
> issue with a screen turning black or blue. . . Gerritsen's reported issues center on
> the operation of the DVD system for rear-seat passengers, he recalls only three
> (total) incident where there was any issue with its front screen or backup camera,
> he has driven his vehicle over 51,000 miles since 2018, and he uses it for long
> trips and "dropping kids off at school and pickups . . . at least ten times a week."

(Def.'s Br. at 22-23).  FCA contends that such testimony is "simply incompatible with any notion

that the vehicles are unmerchantable or not 'fit for driving.'" (*Id.*).

In response to this challenge, Plaintiffs make three arguments: 1) that this Court already rejected this argument at the pleadings stage, when it ruled on the motion to dismiss; 2) that their expert, Steve Loudon opines that all FCA vehicles equipped with a Uconnect system have defect; and 3) vehicles can be unmerchantable even if they have never experienced any symptoms of a defect.

First, Plaintiffs argue that this Court "rejected this very argument at the pleadings stage." (Pls.' Br. at 24).   In ruling upon the prior Motion to Dismiss, the Court ultimately concluded that Plaintiffs had *plausibly alleged* an implied warranty claim such that their claims could proceed. FCA is now arguing that the remaining plaintiffs who have an implied warranty claim cannot proceed with their claims because they lack sufficient evidence to support their claims, based on their own testimony.  Accordingly, this Court has not already ruled upon this *evidence-based challenge* to the remaining implied warranty claims.

In response to this challenge, Plaintiffs also assert that their expert (Steve Loudon) opines that all FCA vehicles equipped with certain Uconnect systems suffer from a defect.  As FCA notes, Loudon testified that he did not inspect the Bagley's vehicle (Loudon Dep. at 63-64) and Gerritsen testified that he had limited and sporadic problems with his vehicle, the majority of which related to the entertainment system.  The Court fails to see how Loudon's opinion can somehow create an issue fact given that this challenge is based on the testimony of the named plaintiffs themselves about their own experiences with their own respective vehicles.

This leads into Plaintiffs' next position, that vehicles can be deemed unmerchantable even if they have never actually experienced any symptoms of a defect.  (Pls.' Br. at 26).  In support of this assertion, Plaintiffs direct the Court to two unpublished district court decisions: 1)

*Chapman v. General Motors, LLC*, 2023 WL 2746780 at *11 (E.D. 2023); and 2) *Johnson v.*

*Nissan N. Am., Inc*., 2022 WL 2869528 at *23 (N.D. Calf. 2022). The Court does not find those

persuasive, in that they addressed the issue without much analysis.

In addition, another judge in this district (Judge Mark Goldsmith) has issued a published

decision wherein he came to the opposition conclusion:

> Nevertheless, "it is not enough to allege that a product line contains a defect or
> that a product is at risk of manifesting this defect." *Taragan*, 2013 WL 3157918,
> at *4 (quoting *O'Neil v. Simplicity, Inc*., 574 F.3d 501, 503 (8th Cir. 2009)). To
> maintain an implied warranty claim under California law, the "plaintiffs must
> allege that their product actually exhibited the alleged defect." *Id*. (emphasis
> omitted).

*Beck v. FCA US LLC*, 273 F.Supp.3d 735, 762 (E.D. Mich. 2017).

To be frank, there are district court decisions that support each of the opposing

viewpoints of the parties as to this challenge to the two remaining implied warranty claims. But

the cases cited by Plaintiffs tend to be motion-to-dismiss decisions, wherein a district court has

allowed an implied warranty claim to proceed based on the allegations. Here, we are at summary

judgment where the Court is considering the evidence, not allegations.

Plaintiffs have not directed the Court to any cases wherein a district court has denied

summary judgment on a breach of implied warranty claim where the owner of the vehicle

testified as to experiencing sporadic problems and keeping the vehicle for several years, and

driving it tens of thousands of miles. At bottom, the Court agrees with FCA that the testimony of

the Bagleys and Gerritsen, of sporadic issues over the course of several years, and their having

driven their vehicles for several years, and tens of thousands of miles, would not allow a

reasonable factfinder to conclude that the alleged defect "drastically undermined the ordinary

32

operation of the vehicle." *Avedisian v. Mercedes-Benz, USA, LLC*, 43 F.Supp.3d 1071, 1079 (C.D. Calf. 2014).

V.      **Fraud-Based Claims (Counts 13-16, 20-22, 27-28 and 38-40).**

Next, FCA's motion seeks summary judgment in its favor as to all of the remaining fraud-based counts.   In response to the motion, Plaintiffs state that they "do not oppose the dismissal of Plaintiff Murdock's fraud-based claims" and "also do not oppose the dismissal of Plaintiff Courtney's claim for fraudulent concealment." (Pls.' Br. at 27 n.25).  Thus, the Court shall dismiss Counts 26 and 38 with prejudice.   The Court must analyze the remaining challenges.

As this Court noted in its January 14, 2022 Opinion and Order, all of Plaintiffs' consumer-protection and fraud-based counts are based upon *omissions,* rather than any purported affirmative misrepresentations.  (*See* ECF No. 66 at PageID.2408).  This Court noted the allegations regarding the alleged omissions were as follows:

> Here, regarding what was omitted, Plaintiffs have alleged "FCA's failure to disclose, at the time of purchase, the Uconnect's marked tendency to fail." (Am. Compl. at PageID 1128).  Plaintiffs allege who should have made the representation: FCA. (Am. Compl. at PageID 1128).  As to how the omission was misleading, Plaintiffs allege that the omission "is material because no reasonable consumer expects to spend hundreds, if not thousands, of dollars to repair or replace the Uconnect Defects in their vehicles." (Am. Compl. at PageID 1128).  Plaintiffs allege that FCA profited from the omission because "Plaintiffs and Class Members would not have purchased the Class Vehicles or would have paid less for them." (Am. Compl. at PageID 1128).

(*Id.* at PageID.2409).

FCA contends that all of these fraud-based claims fail, and make several arguments in that regard.

A.     **Evidence To Show Pre-Sale Knowledge**

First, FCA contends that the claims fail because Plaintiffs lack evidence to show pre-sale

knowledge.  (Def.'s Br. at 24).

At the motion-to-dismiss phase, FCA argued that the complaint failed to sufficiently

allege pre-sale knowledge on behalf of FCA.  Notably, this Court rejected that challenge, stating

as follows:

> FCA argues that Plaintiffs have failed to allege the necessary pre-sale
> knowledge of the defect to sustain the fraud claims. (Def's Br. at PageID 1531).
> However, this argument is not well taken.
> Plaintiffs have alleged that FCA knew about that the Uconnect Defect.
> Plaintiffs allege that FCA knew about the problems with Uconnect from (1)
> technical service bulletins (TSBs), (2) manufacturer communications, (3) recalls
> by FCA for the Uconnect system, (4) complaints made to third parties, such as the
> National Highway Traffic Safety Administration ("NHTSA"), (5) prerelease
> testing data, (6) early customer complaints to FCA and its dealers and the testing
> done by FCA in response to said complaints, (7) high failure rates of the
> Uconnect, (8) data demonstrating the inordinately high volume of replacement
> part sales and other data from FCA dealers about the problem. (Am. Compl. at
> PageID 1169 - 1180).
> Courts in this district have analyzed what is necessary for a plaintiff to
> have alleged presale knowledge of an auto defect many times. See *Flores*, 2021
> WL 1122216 at *20-21; *Francis*, 504 F. Supp.3d at 682; *Gant*, 517 F.Supp.3d at
> 721-723; *Milisits*, 2021 WL 3145704 at *4; *Wozniak*, 2019 WL 108845 at *3.
> Upon the Court's review of these cases, it appears that Plaintiffs allegations are
> most similar to those in *Francis*, in which the court held that the plaintiffs' met
> the pleading standard with specific allegations that the defendant knew about the
> defect from:
>
> > (1) experience with a materially similar predecessor transmission
> > design in the 6L50 model, (2) results of internal pre-production
> > testing on the new models, (3) complaints by test drivers and early
> > buyers when the cars first went to market, and (4) complaints
> > submitted through the defendant's dealer network and via public
> > authorities such as NHTSA.
>
> *Francis*, 504 F. Supp.3d at 682. The *Francis* court went on to describe the
> significance of the defendant's issuance of more than 60 TSBs addressing the

same symptoms of the defect at issue in that case and "thus adequately alleging that [defendant] was aware of and attempting to cope with the same defect the plaintiffs have described." *Id*.

Here, at least 13 TSBs were issued by FCA from 2016 to 2019 advising dealers of potential customer complaints and promoting an (allegedly defective) software update to address the problems. (Am. Compl. at PageID 1169-1174). These TSBs consistently describe the symptoms of the defect in similar terms to the accounts in the Amended Complaint, including: "touchscreen freezing up or becomes inoperative", "rear view camera does not display on screen", "backup camera screen blank" , and "radio control screen blank or locked." (Am. Compl. at PageID 1169-1174). Therefore, Plaintiffs have adequately alleged that FCA was aware of and attempting to cope with the same defect that the plaintiffs have described.

(1/14/22 Opinion & Order at PageID.2409–2411).

Notably, those allegations regarding the TSBs are supported by evidence of the actual TSBs. In addition, Plaintiffs assert that their discovery and expert analysis further support their position and provide ample evidence to at least create an issue of fact as to whether they can establish FCA's pre-sale knowledge. (*See* Pls.' Br. at 27-30). The Court rejects this over-arching challenge to the remaining fraud-based claims.

## B. Evidence To Support "Active Concealment"

There are four remaining claims of fraudulent concealment: Count 13 (Bagleys, Gerritsen, and Swindle under California law) and Count 20 (Kloszewski under Florida law).

The challenge discussed above leads into FCA's next challenge. In this section, that begins on page 25 of FCA's brief, FCA contends that Plaintiffs lack evidence to support "active concealment." This is a two-part challenge.

First, FCA asserts that any active concealment could not be possible unless FCA had knowledge of a defect. But as explained above, the Court concludes there is sufficient evidence to create an issue of fact as to whether FCA had pre-sale knowledge. That ends this first part of

the argument.

Second, FCA asserts that Plaintiffs have "no evidence to show any 'affirmative acts of concealment' regarding the alleged defect here." (Def.'s Br. at 26).

In response to this argument, Plaintiffs do not appear to dispute that they lack evidence of any active concealment. (*See* Pls.' Br. at 3). Rather, Plaintiffs assert that "active concealment is just one circumstance under which a duty to disclose arises," and therefore "Plaintiffs are not required to prove FCA's active concealment to prevail on their claims." (Pls.' Br. at 30 n.26). In support of this position, Plaintiffs direct the Court to its own motion-to-dismiss Opinion and Order, wherein it stated that:

> Under California law, a defendant has a duty to disclose an alleged defect under four circumstances: (1) the defendant is in a fiduciary relationship with the plaintiff; (2) the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) the defendant actively conceals material facts from the plaintiff; or (4) the defendant makes partial representations but also omits some material facts. *Heliotis v. Schuman*, 181 Cal.App.3d 646, 651 (1986); *LiMandri v. Judkins*, 52 Cal.App.4th 326, 336 (1997). Plaintiffs assert that FCA had a duty to disclose based on exclusive knowledge and based on its active concealment of material fact. (Pl's Br. at PageID 1821).
>
> "'[A] fact is deemed 'material,' and obligates an exclusively knowledgeable defendant to disclose it, if a 'reasonable [consumer]' would deem it important in determining how to act in the transaction at issue.'" *Elias v. Hewlett–Packard* Co., No. 12–CV–00421–LHK, 2013 WL 3187319 at *11 (N.D.Cal. Jun.21, 2013) (quoting *Collins v. eMachines,* Inc., 202 Cal.App.4th 249, 256, 134 Cal.Rptr.3d 588 (2011)). Nondisclosures about safety considerations of consumer products are material. *Falk v. General Motors Corp.,* 496 F.Supp.2d 1088, 1096 (N.D.Cal.2007).

(ECF No. 66 at PageID.2413-14).

Plaintiffs also note that FCA had a duty to disclose under Florida law because "a duty to disclose arises under Florida law when one party possesses superior knowledge. *See Harrison v. General Motors, LLC,* 2023 WL 348962, at *8 (E.D. Mich. Jan. 19, 2023); *In re Gen. Motors Air*

36

*Conditioning Mkt. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 638 (E.D. Mich. 2019)."
(Pls.' Br. at 34).

Plaintiffs contend that they can proceed with their omission-based claims because there is no evidence that FCA disclosed its knowledge of the Uconnect defect prior to Plaintiffs purchasing their respective vehicles.

The Court rejects the challenges in this section of FCA's brief and proceeds to address the other challenges.

### C.       Evidence To Support Materiality/Duty To Disclose

Next, FCA argues that "an omission-based claim can only succeed if the defendant was under a duty to disclose, but material facts were withheld." (Def.'s Br. at 26). FCA asserts that the "mere possibility Plaintiffs' vehicles might eventually require some repair obviously does not suffice, as reasonable consumers expect periodic repairs will be required for any vehicle (and, indeed, several Plaintiffs outright admit they knew their own vehicles would require repairs when they bought them). *See* SOF Nos. 3, 19, 63. Rather, Plaintiffs must adduce evidence showing that FCA US withheld material information that it was under a duty to disclose. But, they lack such evidence." (*Id.* at 26-27).

In this section of its brief, FCA challenges the omission-based claims of: 1) the Bagleys, Gerritsen, and Swindle under California law; 2) Courtney under Illinois law; 3) Kloszewski under Florida law; and 4) Murdock under Pennsylvania law.

### 1.       California (Bagleys, Gerritsen & Swindle) (Counts 13, 14

In challenging the omission-based claims under California law brought by the Bagleys, Gerritsen, and Swindle, FCA asserts:

Indeed, under California law, proving materiality and a duty to disclose requires evidence showing the alleged defect either presents an "unreasonable safety hazard" or is so significant it negates a product's "central functionality" by rendering it "incapable of use by any consumer." *Oddo v. Arocaire Air Conditioning & Heating*, 2020 WL 5267917, *25 (C.D.Cal. 2020) (quoting *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 863-64 (9th Cir. 2018)); *see also Nava v. Kobe Steel, Ltd.*, 2019 WL 4729540, *2 (N.D.Cal. 2019). To meet the "unreasonable safety hazard" standard, "[s]peculative risks that depend on the malfunction occurring in particular circumstances are generally not enough to trigger a duty to disclose." *Gaines v. Gen. Motors, LLC*, 2020 WL 1275652, *6 (S.D.Cal. 2020). And, to meet the "central functionality" standard, a defect must be so serious it that it "renders those products incapable of use by any consumer." *Hodsdon*, 891 F.3d at 864; *see also Ahern v. Apple Inc.*, 411 F.Supp.3d 541, 567 (N.D.Cal. 2019).

Even the Bagleys do not believe their experiences with a Uconnect screen briefly turning black or blue "less than two dozen times" since 2017 show a nonspeculative and "unreasonable" safety issue, or that their vehicle is "incapable of use by any consumer" – this is evident from the fact they continue driving their children in that vehicle today. *See* SOF Nos. 6-9, 12-14. Gerritsen's complaints about rear-seat infotainment screens and audio also clearly fail to meet either standard, and he can only point to one service visit in 2019 and "maybe" three total instances where he experienced some momentary issue with his vehicle's rearview camera. *See* SOF Nos. 35, 37, 41, 45, 47. Swindle's one report that his used vehicle's radio "not turning on" after 68,695 miles similarly fails. *See* SOF No. 83.

(Def.'s Br. at 27).

As Plaintiffs note in their brief, this Court has already made rulings as to this issue that

support Plaintiffs' position:

FCA is incorrect when it argues that the California Plaintiffs are required to prove either a safety defect or a defect that negates a product's central functionality." ECF No. 93, PageID.2598. As the Court previously noted, materiality only requires that a "reasonable consumer" would deem the fact "important in determining how to act in the transaction at issue." ECF No. 66, PageID.2414 (quoting *Elias v. Hewlett–Packard Co.*, 2013 WL 3187319, at *11 (N.D. Cal. Jun.21, 2013)); *see also id*. (a manufacturer has a duty to disclose any defects that fall within the warranty period, whether relating to safety or costly repairs, that would have caused the consumer to not purchase the car if they had been disclosed." (quoting *Apodaca v. Whirlpool Corp.*, 2013 WL 6477821 at *7 (C.D. Cal. Nov. 8, 2013).

> Whether a "reasonable consumer" would find the Uconnect Defect to be a material fact is a question for the jury to answer. *See, e.g.*, *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1176 (2015), *as modified on denial of reh'g* (Aug. 21, 2015) ("Materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it."). In so doing, the jury will be able to consider the testimony of each Plaintiff stating that they would not have purchased their vehicle had they known about the Uconnect Defect and the analysis of Plaintiffs' economic experts, who will opine on the market value of Class Vehicles with full disclosure of the Uconnect Defect. *See* Ex. 26, Steve Gaskin Expert Report and Ex. 27, Colin Weir Expert Report.
>
> Accordingly, FCA "has not met its burden to show that the [Uconnect Defect] cannot be considered safety-related, central to functionality, *or otherwise immaterial as a matter of law*." *Bledsoe v. FCA US LLC*, 2023 WL 2619132, at *27 (E.D. Mich. Mar. 23, 2023) (emphasis added).

(Pls.' Br. at 32-33).  The Court rejects this challenge.

### 2.      Illinois (Courtney)

In challenging Plaintiff Courtney's claims brought under Illinois law in Counts 27 and 28,

FCA asserts:

> Courtney's common-law fraud and negligent omission claims fail because, under Illinois law, no duty to disclose arises absent a "special trust relationship between a plaintiff and defendant [that] is extremely similar to that of a fiduciary relationship" – but he has no evidence of any such relationship. *See Flynn v. FCA US LLC*, 327 F.R.D. 206, 218 (S.D.Ill. 2018); *Disher v. Tamko Bldg. Prod., Inc.*, 2015 WL 4609980, *4 (S.D.Ill. 2015). And, any notion that his random issues with rear-seat infotainment was "material" is negated by his extensive use of the vehicle. *See* SOF Nos. 21-28, 30-31.

(Def.'s Br. at 28).

FCA's reply brief correctly notes that Plaintiffs failed to respond to its lack of

materiality/duty to disclose challenges to Courtney's claims under Illinois law and FCA therefore

contends that Courtney should be deemed to have conceded his omission-based claims.  (Def.'s

Reply Br. at 11).

The Court agrees with FCA that the Court should grant summary judgment in its favor as to these two counts due to Plaintiffs' failure to oppose its challenge.  FCA accurately quoted the above cases, that support its legal argument.   And by failing to respond to FCA's argument, Courtney has waived these issues.  *See, eg., Humphrey v. U.S. Attorney General's Office*, 279 F. App'x 328, 331 (2008).

### 3.   Florida (Kloszewski)

In challenging Plaintiff Kloszewski's omission-based claims brought under Florida law, FCA asserts:

> Kloszewski's omission claims under Florida law likewise require evidence showing a duty to disclose, which only "arises when one party has information that the other party has the right to know because of the fiduciary or other relationship of trust or confidence between them." *Merch. One, Inc. v. TLO, Inc.*, 2020 WL 248608, **6-7 (S.D.Fla. 2020); *see also R.J. Reynolds Tobacco Co. v. Whitmire*, 260 So.3d 536, 538–39 (Fla.App. 2018). Since she has no such evidence, her claims would fail even if she could somehow show the (repaired) blank-screen issue and problems with Sirius radio and pairing her key fob were material. *See* SOF Nos. 53-60.

(Def.'s Br. at 28-29).

In response, Plaintiffs direct the Court to decisions from other judges in the Eastern District of Michigan that say otherwise.  (Pls.' Br. at 34) (citing *Harrison v. General Motors, LLC*, 2023 WL 348962 at * 8 (E.D. Mich. 2023 J. Michelson) and *In re Gen. Motor Air Conditioning Mktg. & Sales Practices Litig.*, 406 F.Supp.3d 618, 638 (E.D. Mich. 2019 J. Leitman)

This Court shall follow the judges in this district that have sided with Plaintiffs' position. In *Harrison*, Judge Michelson ruled as follows on this issue:

As for Florida, courts in this District have found that superior knowledge is an

exception to the duty to disclose under Florida law. *See Chapman v. Gen. Motors, LLC*, 531 F.Supp.3d 1257, 1291 (E.D. Mich. 2021) (denying motion to dismiss because superior knowledge is an exception to the duty to disclose under Florida law); *In re Gen. Motors Air Conditioning Mktg. & Sales Practices Litig.*, 406 F. Supp. 3d 618, 638 (E.D. Mich. 2019) (same (citing Majdipour v. Jaguar Land Rover N. Am., LLC, No. 12-07849, 2015 WL 1270958, at *13 (D.N.J. Mar. 18, 2015))); *see also Majdipour*, 2015 WL 1270958, at *13 (holding that plaintiff plausibly alleged that auto manufacturer "had superior knowledge of the alleged defect" which could "establish a duty to disclose" under Florida law); *Estate of Pilgrim v. Gen. Motors LLC*, ―― F. Supp. 3d ――, 2021 WL 989322, at *9 (E.D. Mich. 2022) (same). And Florida law provides a basis for this conclusion. *See Nessim v. DeLoache*, 384 So. 2d 1341, 1344 (Fla. Dist. Ct. App. 1980) ("The classic illustration of fraud is where one party having superior knowledge intentionally fails to disclose a material fact, which is not discoverable by ordinary observation[.]" (internal citations omitted)). So, for the reasons given above, the Court will allow the fraud-by-omission claims to survive under Florida law.

*Harrison, supra*, at * 8. Thus, the Court rejects this challenge to Kloszewski's omission-based claims (Count 20, 21 & 22). Counts 20, 21, & 22 remain in this case.

### 4.    Pennsylvania (Murdock) (Counts 39 & 40)

In challenging Plaintiff Murdock's omission-based claims brought under Pennsylvania law, FCA asserts:

> Murdock's claims are brought under Pennsylvania law, but that state limits the duty to disclose to defects that "ha[ve] caused, or [are] likely to cause, serious bodily harm." *Matanky v. Gen. Motors LLC*, 370 F.Supp.3d 772, 795-98 (E.D.Mich. 2019); *see also Smith*, 988 F.3d at 879. Plaintiffs have no evidence to prove this, and, aside from one report of a screen "go[ing] blank" in 2017 (which Murdock never reported again despite being told by the dealership to return if it reoccurred), his complaints relate to issues with the vehicle's climate controls and remote-start feature for heated seats/wheels. *See* SOF Nos. 65-76, 78.

(Def.'s Br. at 29).

In a footnote to their brief, Plaintiffs state that they "do not oppose dismissal of Plaintiff Murdock's fraud-based claims."  (Pls.' Br. at 27 n.25).  Thus, Count 38 ("Fraudulent Concealment") is conceded.  And Plaintiffs either directly conceded (by virtue of that footnote),

or conceded by failing to address, the above challenge to Murdock's remaining omission-based claims (Counts 39 & 40).

### D.     "Unfair" Or "Unlawful Claim" (Count 15)

Count 15 asserts a claim for "Violation of California Business and Professions Code § 17200, *Et Seq.*" on behalf of Gerritsen, Swindle, and the Bagleys.

FCA argues that it is entitled to summary judgment as to this Court (as to all three California plaintiffs) because:

> Since the Bagleys, Gerritsen, and Swindle cannot prove any claim under the "fraudulent" prong of the UCL (*see supra*), their claims under the "unfair" and "unlawful" prongs likewise fail. *See, e.g.*, *Wilson*, 668 F.3d at 1145 fn.5 ("failure to disclose a fact that a manufacturer does not have a duty to disclose … does not constitute an unfair or unlawful practice"). Their claims under the "unfair" prong also independently fail because they have no evidence which could establish any anti-competitive behavior, or any conduct that is "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Cornejo v. JPMorgan Chase Bank*, 2011 WL 6149246, *5 (C.D.Cal. 2011); *see also Taragan*, 2013 WL 3157918, at *8. Additionally, Plaintiffs' "unlawful" UCL claim fails along with their statutory claims. *See, e.g.*, *Altman v. PNC Mortg.*, 850 F.Supp.2d 1057, 1077 (E.D.Cal. 2012).

(Def.'s Br. at 29-30).

The first part is a derivative argument, meaning that it only prevails if FCA prevails on the preceding argument.  As explained above, it does not.  Thus, this challenge is rejected as well.

### E.     Affirmative Representations To Support Courtney's ICFA Claim (Count 27)

In Count 27, named Plaintiff Randall Courtney asserts a claim for Violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA").  That is the only remaining ICFA claim in this case.

The Court is already granting summary judgment in favor of FCA as to this count, for the reasons set forth in a prior section of this Memorandum.  FCA's brief also challenges this same count on an additional basis, and the Court concludes that challenge has merit too.

FCA contends that "[t]o prevail on any claim under the ICFA based on an omission, Courtney must prove he had some pre-sale communication from FCA US that could and should have contained the allegedly withheld information. *See, e.g.*, *Darne v. Ford Motor Co.*, 2015 WL 9259455, *9 (N.D.Ill. 2015); *see also Flynn*, 327 F.R.D. at 219 (granting summary judgment in favor of defendant on ICFA claim because plaintiff "cannot identify a specific communication between himself and the defendant")."  (Def.'s Br. at 30).  FCA asserts that because Courtney lacks evidence of such a specific pre-sale communication, his ICFA claim fails.

In response, Courtney does not dispute that he must present evidence of a pre-sale communication.  Rather, he contends that he has such evidence.  (Pls.' Br. at 34-35).  Courtney asserts that an unidentified salesperson at the third-party "dealership where he purchased his vehicle told him that the Uconnect system in his vehicle was great, without disclosing any information about the Uconnect Defect."  (Pls.' Br. at 34). In unpublished decisions wherein California courts have addressed this Illinois statute, some courts have suggested that such evidence may be sufficient to show the requisite pre-sale communication needed to proceed with an ICFA claim.  *See Plotts v. American Honda Motor Corp., Inc.*, 2023 WL 4843342 at *7 (C.D. Calf. 2023); *Baranco v. Ford Motor Co.*, 294 F. Supp.3d 950, 969 (N.D. Cal. 2018).  But those were motion-to-dismiss decisions, not summary judgment decisions, and they involve alleged statements by someone at a dealership, not a pre-sale communication by the defendant

43

manufacturer.

That leaves Courtney with his testimony that, before purchasing his vehicle, he looked at FCA's website and saw some unspecified FCA television advertising.[1]

On balance, the Court concludes that FCA has the stronger position on this issue and shall grant summary judgment in favor of FCA as to Courtney's Count 27 ICFA claim.

"An ICFA claim requires '(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception.'" *Darne v. Ford Motor Co.*, 2015 WL 9259455 at *9 (N.D. Ill. 2015) (quoting *De Bouse v. Bayer*, 922 N.E.2d 309, 313 (Ill. 2009)).  "An 'omission' under the ICFA is an omission from a communication, not a general failure to disclose.*"  Darne, supra.*

Like FCA asserts here, the defendant in *Flynn* sought summary judgment in its favor on the plaintiff's ICFA claim because the plaintiff "cannot point to a specific communication or advertisement that he saw."  *Flynn,* 327 F.R.D. at 219.  The district court granted summary judgment in favor of the defendant.  In doing so, it explained that "Illinois courts have held that a plaintiff cannot establish proximate cause where he cannot identify *a specific communication between himself and the defendant.*"  *Flynn*, 327 F.R.D. at 219 (citing *De Bouse v. Bayer, supra*) (emphasis added).  It concluded the plaintiff offered no evidence that creates a genuine issue of material fact on that issue and granted summary judgment in favor of the defendant.

Similarly, in *Darne,* the district court ruled that the plaintiff's ICFA claim was subject to

---

[1]Courtney alleged that he reviewed the vehicle's Monroney sticker before his purchase (Compl. at 90).  But he does not direct the Court to *any evidence* that he did so.

dismissal because the plaintiff failed to identify a specific communication wherein the defendant manufacturer failed to disclose the alleged defect.

In addition, in *Preston v. American Honda Motor Co., Inc.*, the Ninth Circuit ruled that the "district court correctly dismissed the amended complaint because plaintiffs did not 'allege that they read or relied on the Monroney stickers or any other pre-sale communication before purchasing their vehicles." *Preston v. American Honda Motor Co., Inc.*, 783 F. App'x 669, 670 (9th Cir. 2019). Here, Courtney alleged that he reviewed the vehicle's Monroney sticker before buying it, but has not directed the Court to any evidence that he did so.

Thus, the Court grants summary judgment in favor of FCA, on this additional ground, as to Count 27.

### CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED to the extent that the Court grants summary judgment in favor of Defendant FCA as to the following claims:

- Count 12, wherein Plaintiff Gerritsen and the Bagley's assert an Implied Warranty Claim under California law;

- Count 27, wherein Plaintiff Randall Courtney asserts a claim for Violation of the Illinois Consumer Fraud and Deceptive Practices Act;

- Count 28, wherein Plaintiff Randall Courtney asserts a negligent misrepresentation claim under Illinois law;

- Count 37, wherein Plaintiff Paul Murdock's asserts an Implied Warranty Claim under Pennsylvania law; and

- Counts 39 & 40, wherein Plaintiff Paul Murdock asserts fraud and omission-based claims

under Pennsylvania law.

The motion is DENIED in all other respects.

      IT IS SO ORDERED.

                      s/Sean F. Cox
                      Sean F. Cox
                      United States District Judge

Dated:  July 12, 2024

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 12, 2024, by electronic and/or ordinary mail.

                      s/Jennifer McCoy
                      Case Manager